UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

| | | |
|---|---|---|
| ROBERT KATTULA, an Individual;<br>MARIA KATTULA, an Individual;<br>K&B CAPITAL, LLC, a Michigan<br>limited liability company;<br>LUNA PIER TRUCK DEPOT, LLC,<br>A Michigan limited liability company;<br>and US ENVIRONMENTAL<br>MANAGEMENT, LLC, a Kentucky<br>limited liability company,<br><br>211 Walnut Street, Suite 1<br>Rochester, Michigan 48307<br><br>Plaintiffs,<br>v.<br><br>AARON JADE, an Individual;<br>31800 Northwestern Highway, Suite 207<br>Farmington Hills, Michigan<br><br>PRIME FINANCIAL, INC., a Michigan<br>corporation;<br>31800 Northwestern Highway, Suite 207<br>Farmington Hills, Michigan<br><br>PRIME-CALVERT, LLC, a Kentucky<br>limited liability company;<br>239 South 5th Street, Suite 1102<br>Home Life Building<br>Louisville, Kentucky 40202<br><br>CALVERT PROPERTIES, LLC, a<br>Kentucky limited liability company; and<br>239 South 5th Street, Suite 1102<br>Home Life Building<br>Louisville, Kentucky 40202<br><br>CALVERT MACHINERY, LLC, a<br>Kentucky limited liability company,<br>239 South 5th Street, Suite 1102<br>Home Life Building<br>Louisville, Kentucky 40202 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 5:07CV-52-R<br><br><br><br><br><br><br>VERIFIED COMPLAINT<br><br><br><br>Filed Electronically |

**PETER SCHNEIDERMAN, an individual,**
**23100 Providence Drive, Suite 450**
**Southfield, Michigan 48075**

**PETER M. SCHNIEDERMAN &**
**ASSOCIATES, PC,**
**a Michigan professional corporation,**
**23100 Providence Drive, Suite 450**
**Southfield, Michigan 48075,**

**Defendants.**

_____

## COMPLAINT

## I.

## THE PARTIES

Plaintiffs, Robert Kattula, Maria Kattula, K&B Capital, LLC, Luna Pier Truck Depot, LLC, and U.S. Environmental Management, LLC, state as follows for their Complaint:

1.    Plaintiff Robert Kattula is an individual residing in Troy, Michigan.  He is a citizen of the State of Michigan.

2.    Plaintiff Maria Kattula is an individual residing in Troy, Michigan, and the spouse of Robert Kattula.  She is a citizen of the State of Michigan.

3.    K&B Capital, LLC (hereinafter "K&B"), is a Michigan limited liability company with its principal place of business in Rochester, Michigan.

4.    Plaintiff Luna Pier Truck Depot, LLC is a Michigan limited liability company with its principal place of business in Rochester, Michigan.

5.      Plaintiff U.S. Environmental Management, LLC is a Kentucky limited liability company with its principal place of business located in Rochester, Michigan.

6.      Defendant Aaron Jade is an individual who, upon information and belief, resides in Oakland County, Michigan.

7.      Defendant Prime Financial, Inc. (hereinafter "Prime Financial"), is a Michigan corporation with its principal place of business located at 31800 Northwestern Highway, Suite 207, in Farmington Hills, Michigan.

8.      Defendant Prime-Calvert, LLC (hereinafter "Prime-Calvert"), is a Kentucky limited liability company with its registered office at 239 South 5th Street, Suite 1102, Home Life Building, Louisville, Kentucky 40204 and, upon information and belief, its principal place of business located at 31800 Northwestern Highway, Suite 207, Farmington Hills, Michigan.

9.      Defendant Calvert Properties, LLC (hereinafter ("Calvert Properties"), is Kentucky limited liability company with its registered office at 239 South 5th Street, Suite 1102, Home Life Building, Louisville, Kentucky 40204 and, upon information and belief, its principal place of business located at 31800 Northwestern Highway, Suite 207, Farmington Hills, Michigan.

10.     Defendant Calvert Machinery, LLC (hereinafter "Calvert Machinery") is a Kentucky limited liability company with its registered office at 239 South 5th Street, Suite 1102,

Home Life Building, Louisville, Kentucky 40204 and, upon information and belief, its principal place of business located at 31800 Northwestern Highway, Suite 207, Farmington Hills, Michigan.

11.     Defendant Peter M. Schneiderman is an individual residing in Oakland County, Michigan, with business offices at 23100 Providence Drive, Suite 450, Southfield, Michigan. Peter M. Schneiderman conducts business in the Commonwealth of Kentucky. Schneiderman is a citizen of the State of Michigan.

12.     Defendant Peter M. Schneiderman & Associates, PC is a Michigan professional corporation, with its offices at 23100 Providence Drive, Suite 450, Southfield, Michigan. Schneiderman & Associates conducts business in the Commonwealth of Kentucky. Schneiderman & Associates is a citizen of the State of Michigan.

## II.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964(a), 28 U.S.C. §§ 2201 and 2202, and 15 U.S.C. §1692k(d).

14.     This Court has supplemental jurisdiction over the state law-based claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## IV.

## COMMON FACTUAL ALLEGATIONS

16.     Prime Financial is a predatory lender, which lends money at rates (often usurious) well above conventional interest rates.

17.     Prime Financial "borrows" money from "investors" (including but not limited to Ellen Nelson, Ray Kantor and David F. Gross), with the promise to pay to those "investors" above-market rates of return upon their "investments."

18.     Upon information and belief, the return on those "investments" is predicated upon the efforts and ability of Prime Financial, through Aaron Jade, to find borrowers willing to borrow money at interest rates above the rate of return guaranteed by Prime Financial to its "investors."

19.     Prime Financial profits from the difference in the interest rate charged by Prime Financial to its borrowers, and the rate of return promised by Prime Financial to its "investors."

20.     The "investments" and/or loans by Prime Financial "investors" to Prime Financial are securities within the meaning of the Securities Exchange Act of 1934.

21.     Upon information and belief, the securities sold by Prime Financial to its "investors," many of whom are citizens and residents of various states, do not comply with the disclosure requirements under applicable securities laws and regulations.

22.     To "feed" the avarice of its "investors," Prime Financial, commencing in September 2002, entered into a series of loan transactions with one or more of the Plaintiffs, agreeing to lend money at the stated rate of 17% per annum.

23.     The loans were made upon other terms and conditions that made timely repayment of many of the loans unlikely.

24.     Commencing in 2002, Plaintiffs and/or their affiliates borrowed in excess of $6,500,000.00 from Prime Financial, and repaid in excess of $11,000,000.00, inclusive of principal, interest, attorneys fees (of counsel for Prime Financial), and other related costs and expenses.

25.     Prime Financial, despite demand, has failed and/or refused to provide to Plaintiffs an accounting of the monies paid to Prime Financial by, on behalf of and/or for the benefit of Plaintiffs and their affiliates.

**The Landfill**

26.     Commencing in January, 2003, Prime Financial (or Aaron Jade), in a series of transactions, loaned to one or more of the Plaintiffs a portion of the funds necessary to

enable K&B Capital to close upon the purchase from Bank One certain obligations owing to Bank One from LWD, Inc. and its related entities.

27.     On August 28, 2003, Orders for Relief were entered by the United States Bankruptcy Court for the Western District of Kentucky against LWD, Inc. and its related entities upon the involuntary bankruptcy petitions filed against those entities.  The "lead" bankruptcy case bears case no. 03-51021.

28.     On September 5, 2003, General Environmental Services, LLC ("GES') filed in the Bankruptcy Court for this District a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code that case bears case no. 03-51373.

29.     As of November 15, 2005, and as a consequence of a series of lending transactions including but not limited to those described herein, Prime Financial claimed to be owed (by Plaintiffs, among others) the following amounts under the following notes:

    A.  K&B Plus:  $671,141.95

    B.  Waste Path I:  $1,564,884.17

    C.  Waste Path II:  $723,516.40

    D.  Waste Path III:  $832,090.20

    E.  Luna Pier:  $1,250,000.00 plus accrued, unpaid interest

**Luna Pier Truck Stop**

30.     In mid-2002, K&B Capital learned of an unfinished truck stop located at an exit on Interstate 75, in financial distress, and of the opportunity to acquire the asset.

31.     In September, 2002, K&B Capital and Robert Kattula, as more particularly described below, borrowed from Prime Financial the sum of $1,250,000.00 to purchase the truck stop.

32.     The loan to purchase the truck stop was  intended by the parties to be subordinated to construction financing necessary to complete the construction of the truck stop.

33.     From and after January, 2003, Prime Financial loaned additional funds to one or more of the Plaintiffs, to enable Plaintiff K&B to fund advances to and/or for the benefit of the LWD  Debtors and GES.

34.     The United States Bankruptcy Court scheduled a sale of all the assets of the LWD Debtors and GES (the "Assets").

35.     In anticipation of its purchase of the Assets, Plaintiff K&B Capital caused the formation of, among other entities, Waste Path Sanitary Landfill, LLC, Bluegrass Incineration Services, LLC and US Environmental Management, LLC.

36.     K&B Capital was the successful bidder for all of the Assets of the LWD Debtors and GES.

37.     The most lucrative asset purchased was the Landfill and attendant permits owned by the Debtors.

38.     As a result of disputes with certain of the regulatory agencies within the Commonwealth of Kentucky, K&B Capital  did not retain the Assets purchased, but  in turn immediately sold the operating landfill to Waste Path Sanitary Landfill, LLC, certain of the other real property to US Environmental Management, LLC and affiliates of K&B Capital, the incinerator to Bluegrass Incineration Services, and loaned Dan Sills and Joy Hubb the money to purchase the membership interests in Waste Path Sanitary Landfill, LLC, among other related entities.

39.     Waste Path Sanitary Landfill, LLC, and the underlying landfill operations, are extremely profitable.

40.     As a consequence of the  malpractice of then-counsel for K&B Capital, Robert Kattula and Maria Kattula, K&B Capital was denied the benefit of its bargain in connection with the purchase of the Assets from the bankruptcy estates, and was unable to continue to meet the extortionate demands of Prime Financial.

41.     Suffering from avarice, and apparently realizing that Waste Path Sanitary Landfill, LLC and the underlying landfill operations were extremely profitable, Prime Financial

and Aaron Jade embarked upon an unlawful scheme to seize control of the landfill (and related entities and assets) and the truck stop.

42.     On or about November 16, 2005, Prime Financial, on the one hand, and Plaintiffs, on the other, entered into an agreement to restructure the lending and business relationship between and among the parties (the "Restructure Agreement").

43.     The Restructure Agreement was simple:  in broad terms, Prime Financial would in acquire a fifty (50%) percent interest in the landfill and related assets, and exchange (a) a portion ($1,770,000.00) of the then-outstanding indebtedness of K&B Capital and its related persons and entities would be canceled; (b) the remaining balance of the outstanding indebtedness would be amortized and repaid over ten (10) years at 17% interest per annum from the revenue of the most valuable asset – the solid waste landfill operated by Waste Path Sanitary Landfill; and (c) Prime Financial would terminate its mortgage on the Luna Pier Property (the Luna Pier Note having already been repaid); and (d) Kattula would receive compensation of not less than $10,000.00 per month plus costs and expenses, as well as health care coverage for his family.

A.     **"K&B Plus" Note**

44.     On March 23, 2004 K&B Capital, LLC executed a Promissory Note in favor of Prime Financial, Inc. the amount of $415,000.00 (as amended, the "K&B Plus Note"). (A copy of the K&B Plus Note is attached as Exhibit "1.")

45.     On April 12, 2004, an alleged additional advance was made by Prime Financial to or for the benefit of K&B Capital; the K&B Plus Note was amended and restated in the amount of $603,865.80, even though at least $50,000.00 of the amount reflected in the amended and restated Note was not actually advanced.

46.     Upon information and belief, Prime Financial claims that the obligations evidenced by the K&B Plus Note were, prior to November 15, 2005, secured the following collateral:

       a.     Guaranty dated March 23, 2004 Robert Kattula, Maria C. Kattula, Maria C. Kattula Children's Trust, Maria C. Kattula Living Trust (See Exhibit "2");

       b.     The collateral described in Luna Pier Note (as described above);

       c.     The collateral described in a certain $1.425 Million promissory note (executed by K&B Capital) dated August 21, 2003;

       d.     An assignment of Maria C. Kattula 1% interest in K&B Capital (See Exhibits "3" and "4");

       e.     An assignment of Maria C. Kattula Children's Trust 99.0% interest in K&B Capital (See Exhibits "3" and "4");

f.      First Modification of Loan Documents (Exhibit "5");

g.      A mortgage on 3279 Auburn (which property also collateralizes a promissory note dated September 28, 2000) per Mortgage Modification Agreement dated March 23, 2004, recorded in Liber 32689, p 738, Oakland County (MI) Records (See Exhibit "6");

h.      A mortgage on 3949 Luna Pier pursuant to a Commercial Mortgage recorded October 18, 2002 in Liber 2303, page 32, Monroe County (MI) Records (Exhibit "7"), and Mortgage Modification Agreement dated March 23, 2004 and allegedly recorded in the Monroe County (MI) Records (See Exhibit "8", unrecorded copy);

i.      A mortgage on 4306 Brightwood, Troy, Michigan (Kattula residence) pursuant to a Mortgage Modification Agreement dated March 23, 2004, recorded in Liber 32967, P 687, Oakland County Records (See Exhibit "9"); and

j.      A security interest in a certain loan purchase agreement, as evidenced by UCC financing statement filed October 26, 2004, bearing document 2004205487 (See Exhibit "10").

47.     Interest on the K&B Plus Note was brought current not later than January 31, 2006, by the payment to Prime Financial of $70,141.95.

48.     Pursuant to the terms of the Restructure Agreement, memorialized in part in that certain Memorandum of Understanding dated November 16, 2005, the $600,000.00 principal balance on the K&B Plus note was amortized over a ten (10) year term commencing January 1, 2006, at the rate of seventeen (17%) percent per annum and monthly payments in the amount of $10,427.80 (Exh. "11").

49.     Payments on the K&B Plus Note are current, and the K&B Plus Note is not in default.

**C.      $1,420,000.00 Waste Path I Note.**

50.     On September 1, 2004, K&B Capital, LLC, Robert Kattula, U.S. Environmental Management, LLC, Waste Path Sanitary Landfill, LLC, Liberty Environmental Services, LLC, and Bluegrass Incineration Services, LLC, (collectively the "Waste Path I Borrowers"), as borrowers, executed a Promissory Note in favor of Prime Financial, as lender, in the original amount of $1,420,000.00 (Prime Acct. no 1464/ G/L 5415) (as amended, the "Waste Path I Note").  (A copy of the Waste Path I Note is attached as Exhibit "12").

51.     Upon information and belief, the Waste Path I Borrowers executed an Amended and Restated Promissory Note dated August 4, 2004 in the principal amount of $1,261,932.96.

52.     Upon information and belief, the Waste Path I Borrowers executed an Amended and Restated Promissory Note dated September 1, 2004, in the principal amount of $1,420,000.00.

53.     Upon information and belief, the Waste Path I Borrowers executed an Amended and Restated Promissory Note dated May 10, 2005.

54.     Upon information and belief, Prime Financial claimed that the balance due as of November 15, 2005 under the Waste Path I Note was $1,564,884.17.

55.     Upon information and belief, Prime Financial claims that the obligations evidenced by the Waste Path I Note were, as of November 15, 2005, secured by the following collateral:

    (a)     A mortgage by K&B dated May 13, 2004, as amended May 20, 2004 in Mortgage Book 506, Page 499 (Calvert City);

    (b)     An assignment of Robert Kattula's interest in;

        (i)     U.S. Environmental Services, LLC (KY);

        (ii)     Waste Path Sanitary Landfill, LLC;

        (iii)     Liberty Environmental Services, LLC (KY);

        (iv)     Bluegrass Incineration Services, LLC (KY); and

(c)      the grant of an all asset lien.

56.      Upon information and belief, the alleged security interest was perfected by the filing of a UCC financing statement.

57.      Upon information and belief, Prime Financial's books and records reflected a balance of $1,564,884.17 as of November 15, 2005.

58.      The obligations of the Waste Path I Borrowers were, pursuant to Assignment of Promissory Note dated November 16, 2005 and executed in furtherance of the Restructure Agreement assigned as follows (Exh. "13"):

(a)      to Prime Calvert, LLC, the amount of $1,000,000.00 (Exh. "14"); and

(b)      to Calvert Properties, LLC, the amount of $420,000.00 (Exh. "15").

59.      The Waste Path I Borrower(s) "retained" $144,884.17 of the obligations under the Waste Path I Note.

60.      Pursuant to the November 16, 2005 Assignment of Promissory Note (Exhibit "13"), the   then-existing collateral remained a security for the obligations under the

Waste Path I Borrowers, but the Waste Path I Note was thereafter non-recourse to the Waste Path I Borrowers (¶5).

61.　　Prime Financial unlawfully demanded, as additional consideration to Prime Financial for its consent to the assignments, that:

(a)　　U.S. Environmental Management, LLC deed as additional security 600+/- acres of property in Calvert City to Prime-Calvert, LLC ; and

(b)　　the Assignment to Calvert Properties of a 90% interest in Waste Path Sanitary Landfill, LLC (characterized as "acceptance" by Calvert Properties of a 90% interest in Waste Path Sanitary Landfill, LLC), one-half of which membership interest would pursuant to the Restructure Agreement, as memorialized in part in the Memorandum of Understanding, be held in trust for the benefit of Robert Kattula (Recital F).

62.　　The remaining obligations of the Waste Path I Borrowers under the Waste Path I Note were paid in full not later than January 31, 2006.

D.     **Prime-Calvert's Indebtedness.**

63.     Upon assignment of $1,000,000 of the Waste Path I Note, Prime-Calvert, LLC, owed Prime Financial $1,000,000.00 as of November 16, 2005.

64.     Prime Financial contributed to the capital of Prime-Calvert, LLC the debt of Prime-Calvert, LLC to Prime Financial, in exchange for all of the membership interests in Prime-Calvert, LLC.

65.     The Operating Agreement for Prime-Calvert reflects Prime Financial as the sole member of Prime-Calvert.

66.     Prime-Calvert claims ownership of the 600 +/- acres previously titled in the name of U.S. Environmental Management, LLC; that "ownership" interest is, however, an equitable mortgage held as security for the repayment obligations under the Restructure Agreement.

67.     Prime-Calvert subsequently leased the 600 +/- acres to Waste Path Sanitary Landfill, LLC for $14,166.67 per month, a "rent" payment equal to interest on the sum of $1 million at 17% per annum.

68.     Prime Financial has retained the "lease" payments for its own account, and has not credited the "lease" payments to the outstanding indebtedness.

### E.      Calvert Properties' Indebtedness.

69.     Upon assignment of $420,000.00 of the Waste Path I Note, Calvert Properties, owed Prime Financial $420,000.00 as of November 16, 2005.

70.     Prime Financial contributed to the capital of Calvert Properties the "debt" of Calvert Properties to Prime Financial in exchange for all of the membership interests in Calvert Properties, LLC (Exh. 10, p.7) and (Exh. 20).

71.     The Operating Agreement for Calvert Properties, however, reflects Aaron Jade – not Prime Financial – as the sole member of Calvert Properties.

72.     The transaction was illusory; despite the assignments, and contribution of the debt to the capital of Prime Calvert and Calvert Properties, Prime Financial (directly or through its owner, Aaron Jade) continued, through the Prime Calvert Lease (and Prime Financial's lease of 124 acres deeded to Prime Financial by Jasmat, an affiliate of K& B Capital, in exchange for a reduction in debt and as additional security for the repayment of the remaining obligations), to charge and collect interest at the rate of 17% on the $1 Million in debt, but not credit those "lease" payments against the outstanding indebtedness.

### F.      "Waste Path II" Note

73.     On October 21, 2004, K&B Capital, LLC, Robert Kattula, U.S. Environmental Management, LLC, Waste Path Sanitary Landfill, LLC and Bluegrass

Incineration Services, LLC (the "Waste path III Borrowers"), as borrowers, executed a Promissory Note (as amended, the "Waste Path II Note") in favor of Prime Financial, as lender, in the original amount of $650,000.00 (Prime Account 1465/GL 5426). (A copy of the Waste Path II Note is attached as Exhibit "16.")

74.     Upon information and belief, Prime Financial claims that the obligations under the Waste Path II Note were secured by an assignment of K&B's rights, title and interest under a certain Loan Purchase Agreement (Comerica loan to Michigan Pumping) (Exhibit "17").

75.     There are no guarantors of the Waste Path II Note.

76.     On May 10, 2005 the Waste Path II Borrowers executed an Amended and Restated Promissory Note.

77.     As of November 16, 2005, Prime Financial claimed that the indebtedness due under the Waste Path II Note was $723,516.40.

78.     On November 16, 2005, pursuant to a Partial Assignment of Promissory Note executed in connection with the Restructure Agreement, Calvert Machinery, LLC (KY) assumed $350,000.00 of the obligations under the Waste Path II Note via a promissory note dated November 16, 2005.

79.     The Waste Path II Borrowers initially "retained" $73,516.40 of the indebtedness under the Waste Path II Note (representing that portion of the debt attributable to

accrued interest, late charges, attorneys fees), which balance plus accrued interest was paid on January 3, 2006.

80.     The Waste Path II Borrowers retained the obligation to pay the $300,000.00 balance (third note) remaining due from the Waste Path II Borrowers.

81.     Although ¶ D of the Recitals in the Partial Assignment reflect that the entirety of the $650,000.00 in debt owing under the Waste Path II Note was assigned to Calvert Machinery, LLC., the Prime Financial General Ledger reflects $300,00.00 as a beginning balance as of February 1, 2006.

82.     Upon assignment of the Waste Path II Note on November 16, 2005, Calvert Machinery, LLC, owed Prime Financial not more than $350,000.00.

83.     Prime Financial contributed to the capital of Calvert Machinery the $350,000.00 in debt of Calvert Machinery to Prime Financial, in exchange for the 100% membership interests in Calvert Machinery.

84.     Pursuant to the terms of that certain Memorandum of Understanding dated November 16, 2005, executed in connection with the Restructure Agreement, the remaining $300,000.00 balance due on the Waste Path II note was amortized over a ten (10) year term commencing January 1, 2006 at the rate of 17% per annum.

85.     Contemporaneously with the assignment of a portion of the indebtedness due under the Waste Path II Note, Prime Financial caused <u>Waste Path Sanitary Landfill, LLC</u> (in the absence of any consideration) was obligated to assign to <u>Calvert</u> <u>Properties</u> certain equipment (Partial Assignment, Recital E).

86.     The Bill of Sale for the equipment, however, is to Calvert <u>Machinery</u>, LLC; that sale and assignment was not intended to convey ownership of the equipment but, rather, a security interest in favor of Prime Financial as additional security for the repayment obligations under the Restructure Agreement.   In addition, Prime Financial caused the Bill of Sale (Exhibit "17a") to Calvert Properties to include more machinery and equipment than provided for in the assignment, the value of which additional machinery and equipment should have reduced the outstanding principal owing by Plaintiffs to Prime Financial.

87.     Calvert Machinery in turn, "leased" the equipment back to Waste Path Sanitary Landfill, LLC.

88.     Prime Financial has retained the "lease" payments for its own account, and has not credited the "lease" payments in the amount of $6,083.00 per month to the outstanding indebtedness.

## G.     $750,000.00 ("Waste Path III Note") (Exhibit "4").

89.     On December 2, 2004, K&B Capital, LLC, Robert Kattula, U.S. Environmental Management, LLC, Waste Path Sanitary Landfill, LLC and Bluegrass

Incineration Services, LLC (the "Waste Path III Borrowers") executed in favor of Prime Financial a Promissory Note (as amended, the "Waste Path III Note") in the principal amount of $350,000.00. (A copy of the Waste path III Note is attached as Exhibit "18.").

90.     On April 13, 2005, Prime Financial claims to have advanced the sum of $130,309.88, and the Waste Path III Borrowers executed an amended and restated Note in the amount of $480,309.88.

91.     Upon information and belief, Prime Financial claims that the obligations under the Waste Path II Note were secured by the following collateral:

    (a)     the collateral described in the Waste Path II Note dated October 21, 2004; and

    (b)     the collateral described in that $350,000.00 note dated May 13, 2004, as amended May 20, 2004; as amended June 10, 2004; as amended July 16, 2004; as amended July 16, 2004; as amended September 1, 2004 (a promissory note executed by the Waste Path III Borrowers and Liberty Environmental Services, LLC (KY)).

92.     All accrued, unpaid interest on the Waste Path III Note was paid not later than January 31, 2006.

93.     Pursuant to the terms of the Restructure Agreement, as memorialized in part by the Memorandum of Understanding dated November 16, 2005, the remaining balance of $750,000 on the Waste Path III Note to be amortized and repaid over ten (10) years at the rate of 17% per annum with monthly payments of $12,852.74.

94.     The payments on the Waster Path III Note are current, and the Waste Path III Note is not in default.

### H.     $1,250,000.00 "Luna Pier Note"

95.     On September 30, 2002 K&B Capital and Robert Kattula (see Exhibit "19") executed in favor of Prime Financial a Promissory Note in the original amount of $1,250,000.00 (the "Luna Pier Note").

96.     Upon information and belief, Prime Financial claims that the obligations under the Luna Pier Note were secured by the following collateral:

(a)     Mortgage dated September 30, 2002, recorded in Monroe County Records on October 16, 2002, Liber 2303, P32 (Exhibit "9");

(b)     Assignment of Rents & Leases dated September 30, 2002, recorded in Monroe County Records on October 16, 2002, Liber 2303, P 59 (Exhibit "10")

(c)     Security Agreement (Exhibit "11");

      (d)     UCC Financing Statement recorded October 7, 2002 with Secretary of State, UCC Financing Statement recorded in Monroe County Records on October 16, 2002, Liber 2303, P 68 (Exhibit "12");

      (e)     Guaranty dated March 23, 2004 by Maria C. Kattula Children's Trust, Maria C. Kattula Living Trust (Exhibit "13"); and

      (f)     Reaffirmation of Guaranty dated March 23, 2004 by Robert Kattula, Maria Kattula and TAJ Graphic Enterprises, LLC (Exhibit "48").

97.    By letter dated November 15, 2005, Prime Financial acknowledged in writing that the Luna Pier Note was paid in full.

98.    Notwithstanding payment in full of the Luna Pier Note, Luna Pier Truck Depot, LLC is alleged to have "joined" as co-obligor under the Luna Pier Note pursuant to Second Modification of Loan Documents dated November 16, 2005 (see Exhibit "11").

99.    Despite payment in full of the Luna Pier Note, Prime financial continued to assert a balance due, and caused all of the alleged accrued, unpaid interest due under the Luna Pier Note to be paid not later than June 30, 2006.

100.    Prime Financial claims the balance due under the Luna Pier Note as of June 30, 2006 was allegedly $1,250,000.00.

101.    Pursuant to the terms of the Restructure Agreement, as memorialized in part in the  Memorandum of Understanding, any outstanding balance due under the Luna Pier Note was to be amortized and repaid over a ten year period with interest at the rate of 17% per annum, requiring monthly payments; and Prime Financial agreed to terminate its mortgage interest in the Luna Pier Property on or before January 3, 2006, upon receipt of an anticipated payment from Waste Path Sanitary Landfill, LLC.

102.    The monthly payment required to fully amortize over ten years the balance due that Prime Financial wrongfully claimed remained under the Luna Pier Note is $21,421.24.

103.    Prime Financial has since approximately January 1, 2006 received monthly payments on the Luna Pier Note in an amount averaging not less than  $37,843.00 per month.

104.    Prime Financial has not applied the payments received, in excess of the monthly payment required to fully amortize over ten years the balance Prime Financial claims due under the Luna Pier Note, to reduce the outstanding principal amount of the remaining debt, if any, evidenced by the Luna Pier Note.

105.    Despite receipt of the anticipated payment, Prime Financial has not terminated the Luna Pier Mortgage.

I.      **Agreement dated May 15, 2006.**

106.    On May 15, 2006, Calvert Properties, Robert Kattula and Peter M. Schneiderman & Associates, through Defendant Peter Schneiderman, entered into an agreement (the "May 15, 2006 Agreement") pursuant to which Schneiderman, as escrow agent, undertook to ensure that the appropriate portion of consulting fees received by Calvert Properties from Waste Path Sanitary Landfill would be remitted to Robert Kattula.  (See Exhibit "20.")

107.    The May 15, 2006 refers to the December 1, 2005 Consulting Agreement, pursuant to which a portion of fees are to be paid for benefit of Kattula, and in turn remitted to Kattula.  (See Exhibit "21.")

J.      **Restructuring of Relationship/Memorandum Of Understanding**

108.    In November, 2005 Prime Financial, on the one hand, and the K&B Plus Borrowers, Waste Path I Borrowers, Waste Path II Borrowers, Waste Path III Borrowers and Luna Pier Borrowers, on the other, entered into the Restructure Agreement.

109.    The Restructure Agreement was memorialized, in part, by the execution on November 16, 2005, of a Memorandum of Understanding between Calvert Properties, LLC (through Prime Financial) and Robert Kattula, as well as a variety of other documents.

110.    The Memorandum of Understanding was not an expression of the entire agreement between the parties.

111.    The parties agreed, as the Memorandum of Understanding reflected, the sole source of repayment of the indebtedness to Prime Financial  was from operation of Waste Path Sanitary Landfill, LLC.

112.    As required under the Restructure Agreement, memorialized in part in the Memorandum of Understanding, the principal balances (if any) under the Waste Path II Note, the Waste Path III Note, the K&B Plus Note were to be amortized and paid over ten (10) years, and thereby requiring the following monthly payments made by Waste Path Sanitary Landfill to Prime Financial in satisfaction of those obligations (but only to the extent):

A.    On the Waste Path II Note, monthly payments in the amount of $5,213.93 ($300,000.00 amortized at 17% over 10 years);

B.    On the Waste Path III Note, monthly payments in the amount of $13,034.82 ($750,000.00 amortized at 17% over 10 years);

C.    On the K&B Plus Note, monthly payments in the amount of $10,427.86 ($600,000.00 amortized at 17% over 10 years); and

D.    On the Luna Pier Note, monthly payments in the amount of $21,421.24 ($1,250,000.00 amortized at 17% over 10 years).

113.    Pursuant to the Restructure Agreement, as memorialized in part by the Memorandum of Understanding, the annual revenue of Waste Path Sanitary Landfill was allocated and to be paid to satisfy the following obligations:

(a)     Operating expenses;

(b)     Third party creditors;

(c)     to Prime Financial, to bring current the obligations under the notes;

(d)     to Prime Financial, in an amount sufficient to pay the monthly payments required to satisfy the principal balances, if any, remaining due under the K&B Plus Note, the Waste Path II Note, the Waste Path III Note and the Luna Pier Note, each amortized and paid over a 10 year term at 17% per annum; and

(e)     the balance of the revenue of Waste Path Sanitary Landfill, LLC to be paid to Calvert Properties, and shared 50/50 between Calvert Properties and Robert Kattula.

### K.    Effect Of Memorandum Of Understanding.

114.    Pursuant to the Restructure Agreement, ninety (90%) percent interest of the membership interests in Waste Path Sanitary Landfill, LLC were assigned to Calvert

Properties (for the benefit of Prime Financial and Robert Kattula equally) and K&B Capital canceled a $3 Million promissory note from Waste Path Sanitary Landfill, LLC to K&B Capital, as well as the attendant guaranty of Dan Sills and Melanie Joy Hubb/Sills (K&B was not required, however, and did not terminate various other obligations owed to K&B Capital (or its assignees) by Waste Path Sanitary Landfill, nor its security interest in various assets).

115.    Pursuant to the Restructure Agreement, following the deed by US Environmental Management, LLC of 600+/- acres to Prime Calvert as additional security for repayment of the remaining obligations, Sills and Hubb sold 100% of the membership interests in US Environmental Management, LLC to K&B Capital and K&B Capital cancelled the indebtedness of US Environmental Management to K&B Capital in the amount of $2.5 Million and the attendant guaranty of Dan Sills and Melanie Joy Hubb/Sills.

116.    Pursuant to the Restructure Agreement, Luna Pier Truck Depot, LLC agreed to join as a "co-borrower" on the Luna Pier Note (which had been paid), but the mortgage on the Luna Pier Property was to be terminated on or before January 3, 2006 upon payment of certain funds by Waste Path Sanitary Landfill to Prime Financial.

117.    In derogation of the terms and conditions of the Restructure Agreement, Defendants engaged in a course of conduct designed and intended to defraud Plaintiffs of their rights under the Restructure Agreement, and other valuable property rights.

118.   In furtherance of their fraudulent scheme, Defendants entered into the following transactions, among others, designed to avoid the intent and purpose of the Restructure Agreement:

(a)   a "lease" dated effective December 1, 2005, pursuant to which Prime Financial leased to Waste Path Sanitary Landfill, LLC certain real property approximating 124/+- acres, for a five (5) year term at the rate of $2,833.33 per month;

(b)   a "lease" dated April 4, 2006 but effective December 1, 2005, pursuant to which Calvert Machinery leased to Waste Path Sanitary Landfill, LLC certain unidentified equipment, for a ten (10) year term at the rate of $6,083.00 per month, which "lease" payment, together with other payments disguised as "lease" or "consulting" payments, were nothing more than the continued payment of interest (at the rate of 17% per annum) on the $723,516.40 in debt which was in part assumed by Calvert Machinery, and contributed by Prime Financial as capital to Calvert Machinery, as part of the $1,770,000.00 in debt to be forgiven;

(c)   a lease dated effective December 1, 2005, pursuant to which Prime Calvert leased to Waste Path Sanitary Landfill, LLC the 600 +/- acres assigned by US Environmental Management to Prime

Financial as additional security, for a one (1) year term at the rate of $14,166.67 per month, which "lease" payment was nothing more than the continued interest payment (at 17% interest) on the $1 Million in debt assumed by Prime-Calvert and contributed as capital by Prime Financial to Prime-Calvert., as part of the $1,770,000.00 in debt to be forgiven;

(d)     a Business Consulting Agreement effective December 1, 2005 between Calvert Properties and Waste Path Sanitary Landfill, LLC, with no stated term or stated compensation, a portion of which Consulting Agreement is pursuant to the May 15, 2006 Agreement for the benefit of Kattula; and

(e)     the continued payment of "interest" allegedly due on the Luna Pier Note, despite prior written acknowledgment that the Luna Pier Note was fully paid.

119.   Upon information and belief, in a fraudulent effort to "double dip", the "Luna Pier" payment is also the continued payment of interest at 17% on the aggregate indebtedness reflected ($2,670,000.00) in Luna Pier Note, the Waste Path I Note, and the Waste Path II Note.

## COUNT I

## BREACH OF CONTRACT

120.    The allegations set forth in paragraphs 1 through 119, above, are incorporated by reference as if fully set forth herein.

121.    The Restructure Agreement constitutes a binding contract between the parties.

122.    Prime Financial has breached its obligations under the Restructure Agreement.

123.    As a proximate cause of the breach by Prime Financial of its obligations under the Restructure Agreement, Plaintiffs have suffered damages in excess of Seventy-Five Thousand and 00/100 ($75,000.00) Dollars, exclusive of interest, costs and attorneys' fees.

**WHEREFORE**, Plaintiffs pray that this Court enter its Order:

A.      Granting judgment in favor of Plaintiffs and against Defendant Prime Financial, Inc. in such amount as may be proven at trial;

B.      Compelling Prime Financial to terminate the Luna Pier Mortgage;

C.     Awarding in favor of Plaintiffs and against Defendant Prime Financial, Inc. those costs, including actual attorneys' fees, incurred in seeking this relief; and

D.     Awarding such other relief as may be just and equitable under the circumstances.

## COUNT II

**VIOLATION OF 18 U.S.C. §1962(c)
(RACKETEER AND CORRUPT ORGANIZATIONS ACT)
(WPSL AS ENTERPRISE)**

A.     **The RICO Plaintiffs.**

124.   The allegations set forth in paragraphs 1 through 123, above, are incorporated by reference as if fully set forth herein.

125.   K&B Capital is a Michigan limited liability company capable of holding a legal or beneficial interest in property.

126.   Robert Kattula is a natural person capable of holding a legal or beneficial interest in property.

127.   US Environmental Management is a Kentucky limited liability company capable of holding a legal or beneficial interest in property.

128.    Luna Pier Truck Depot, LLC is a Michigan limited liability company capable of holding a legal or beneficial interest in property.

129.    K&B Capital, US Environmental Management, Luna Pier Truck Depot, LLC and Robert Kattula are each a "person" within the definition of 18 U.S.C. § 1961(3).

### B.    The RICO Defendants

130.    Prime-Calvert, as a Kentucky limited liability company, is capable of holding a legal or beneficial interest in property and is a "person" within the definition of 18 U.S.C. §1961(3).

131.    Calvert Machinery, as a Kentucky limited liability company, is capable of holding a legal or beneficial interest in property and is a "person" within the definition of 18 U.S.C. §1961(3).

132.    Calvert Properties, as a Kentucky limited liability company, is capable of holding a legal or beneficial interest in property and is a "person" within the definition of 18 U.S.C. §1961(3).   (Prime-Calvert, Calvert Machinery and Calvert Properties) are sometimes referred to as the "Prime Affiliates.")

133.    Aaron Jade is an individual, and is a "person" within the meaning of 18 U.S.C. §1961(3).

134.    Peter M. Schneiderman is an individual, and is a "person" within the meaning of 18 U.S.C. §1961(3).

135.    Peter M. Schneiderman & Associates is a Michigan corporation, is capable of holding a legal or beneficial interest in property and is a "person" within the meaning of 18 U.S.C. ' 1961(3).

136.    Prime Financial, is a Michigan corporation, is capable of holding a legal or beneficial interest in property and is a "person" within the meaning of 18 U.S.C. §1961(3).

## C.    The RICO Enterprise.

137.    Waste Path Sanitary Landfill is a Kentucky limited liability company and an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

138.    Waste Path Sanitary Landfill had an objective the legitimate goal of serving as a solid waste disposal facility.

139.    Waste Path Sanitary Landfill exists as a continuing and ongoing organization distinct from the RICO Defendants.

140.    Waste Path Sanitary Landfill is an enterprise engaged in, or conducts activities which affect, interstate commerce.

141.    As a consequence of the unlawful conduct of the RICO Defendants, the legitimate objectives of Waste Path Sanitary Landfill have been thwarted, and Waste Path Sanitary Landfill has instead been used as instrumentality through which the RICO Defendants have engaged in a pattern of racketeering activity.

### D.    The RICO Defendants' Relationships With The RICO Enterprise.

142.    Upon information and belief, at the insistence of Prime Financial, each of Aaron Jade and the Prime Affiliates has entered into one or more agreements with Prime Financial, pursuant to which Prime Financial and the Prime Affiliates have agreed to act collectively with respect to the payment of fees, charges and assessments to Prime Financial under the guise of "rent" or "consulting fees," but which payments in fact are the continued payment of interest on indebtedness that has been fully paid or otherwise fully satisfied.

143.    Aaron Jade is associated with Waste Path Sanitary Landfill, directing the affairs of Waste Path Sanitary Landfill through the provision of business advice and financial services to Waste Path Sanitary Landfill concerning such issues as acceptable terms and conditions, the negotiation of contracts for the provision of goods and services, and the resolution of disputes with suppliers.

144.    Schneiderman and Peter M. Schneiderman & Associates, P.C. are associated with Waste Path Sanitary Landfill, directing the affairs of Waste Path Sanitary Landfill through the provision of business advice and legal services to Waste Path Sanitary Landfill.

145.    Each of RICO Defendants is associated with Waste Path Sanitary Landfill, participating, directly or indirectly, in the conduct of the affairs of Waste Path Sanitary Landfill through a pattern of racketeering activity.

146.    Each of the RICO Defendants' association with Waste Path Sanitary Landfill has continued for a period of not less than three (3) years.

### E.    The Defendants' Liability For The Acts Of The RICO Enterprise

147.    Peter Schneiderman, individually and on behalf of Peter M. Schneiderman & Associates, P.C., each as a representative of Prime Financial; Aaron Jade, through his titular ownership (albeit in trust for Prime Financial and Robert Kattula) of all of the membership interests in Calvert Properties, LLC and Calvert Machinery, LLC; and Prime Financial, through its titular ownership (albeit in trust for Prime Financial and Robert Kattula) of Prime-Calvert, LLC participate directly or indirectly in the operation and management of Waste Path Sanitary Landfill by reason of, among other conduct, directing and controlling the day-to-day operations of Waste Path Sanitary Landfill; and/or participating in directing the affairs of Waste Path Sanitary Landfill  by establishing procedures, policies and goals for the conduct of the affairs of Waste Path Sanitary Landfill .

148.    The RICO Defendants, have participated, directly or indirectly, in the conduct of the affairs of Waste Path Sanitary Landfill through a pattern of racketeering activity;

149.    The RICO Defendants, to fulfill the illegitimate and unlawful goals of Waste Path Sanitary Landfill, controlled and directed the business affairs of Waste Path Sanitary Landfill, through the use of extortionate threats and fraudulent misrepresentations sent via the United States Mail and/or the wires, by way of conduct including, but not limited to, the following:

A.      Compelling and/or directing Waste Path Sanitary Landfill to remit payments via the  U.S. mails or wire to Prime Financial in excess of the outstanding obligations (if any) of the Waste Path II Borrowers, Waste Path III Borrowers, K&B Plus Borrowers and the Luna Pier Borrowers under the Notes; and

B.      Causing Waste Path Sanitary Landfill to remit payment via the U.S. mails to Prime Financial interest payments upon fully-satisfied debt obligations, fraudulently demanding and, characterizing such payments as "lease" payments or "consulting fees";

150.    The RICO Defendants conduct or participate (and continue to participate) directly in the conduct of the affairs of  the Waste Path Sanitary Landfill, through a pattern of racketeering activity.

151.    The RICO Defendants, through Waste Path Sanitary Landfill, intentionally and illegally engage in actions which are intended to interfere with and violate the rights of their intended victims.

F.      **The Pattern Of Racketeering Activity**

1.      **The Scheme Generally**.

152.    The RICO Defendants have engaged in a pattern of racketeering activity designed and intended to unlawfully increase, or cause an increase by unlawful means, and resulting in an unlawful increase in, the amount to be paid by, or on behalf of or for the benefit of Plaintiffs to Prime Financial in satisfaction of the outstanding indebtedness, if any, to Prime Financial, and at usurious rates of interest.

153.    The pattern of racketeering included the RICO Defendants' use of Waste Path Sanitary Landfill to instill in Waste Path Sanitary Landfill the fear of economic harm, for the unlawful purpose of compelling Waste Path Sanitary Landfill to pay sums to Prime Financial in the absence of consideration.

154.    The pattern of racketeering included the RICO Defendants' use of Waste Path Sanitary Landfill to instill in Waste Path Sanitary Landfill the fear of economic harm, for the unlawful purpose of proscribing any attempts by Waste Path Sanitary Landfill to replace the indebtedness to Prime Financial with less expensive financing, and instead compelling Waste Path Sanitary Landfill to borrow money from Prime Financial and upon terms and conditions less than those otherwise commercially available solely for the purpose of meeting the economic demands of Prime Financial's "investors".

155.     The pattern of racketeering included, as a regular practice by the RICO Defendants through Waste Path Sanitary Landfill, the fraudulent representation by Waste Path Sanitary Landfill of its financial condition and affairs, with the intent to deny payments to Calvert Properties (and in turn payment to Robert Kattula).  Those representations were made despite actual knowledge by the RICO Defendants that such statements were false, and/or those statements were made with a reckless disregard for the truth thereof.

156.     The pattern of racketeering further included the RICO Defendants' use of the mails and wires to obtain payment from Waste Path Sanitary Landfill for paid debt, and based upon fraudulent leases and consulting agreement(s).

157.     The pattern of racketeering included conduct designed and intended to use Waste Path Sanitary Landfill to obtain, through extortion and for the financial benefit of the RICO Defendants, payments of profits of Waste Path Sanitary Landfill without concurrent payment to Robert Kattula.

158.     The pattern of racketeering included conduct designed and intended to use Waste Path Sanitary Landfill to obtain, through extortion and for the financial benefit of the RICO Defendants, the conveyance by third parties to the Prime Affiliates, Prime Financial or Aaron Jade of valuable property, without adequate consideration in exchange for such conveyances.

## 2.   The Unlawful Scheme.

159.   As of November, 2005, the Waste Path I Borrowers, Waste Path II Borrowers, Waste Path III Borrowers, K&B Plus Borrowers and Luna Pier Borrowers were allegedly indebted to Prime Financial.

160.   Commencing in November, 2005, the RICO Defendants, engaged in a course of conduct pursuant to which the RICO Defendants fraudulently promised, in exchange for fifty (50%) percent of the profits of Waste Path Sanitary Landfill, and cancellation of debt in excess of $5 Million, to (a) cancel $1,770,000.00 in debt owed by Plaintiffs to Prime Financial, (b) terminate the Luna Pier Mortgage,(c) amortize repayment of the remaining debt over ten (10) years; and (d) share with Robert Kattula fifty (50%) percent of the true profits from the operation of the Waste Path Sanitary Landfill, which promises the RICO Defendants knew, at the time that they made such, would not be honored by Prime Financial.

161.   The fraudulent promises were made by the RICO Defendants via the United States mail and wire.

162.   The success of the scheme depended on the ability of the RICO Defendants making Plaintiffs believe that $1,770.000.00 in debt had been extinguished, but in fact preserving (albeit in disguised form) that debt, so that Prime Financial could still cause itself to be paid, and in turn receive, interest at the rate of 17% on that debt and satisfy its underlying "investors".

163.   The RICO Defendants wrongfully used extortionate threats and fraudulent representations made via the use of the United States Mail and wires to instill in the Borrowers the fear of economic harm, as a means of causing the Plaintiffs to "accept" the terms of the scheme.

164.   The scheme was effectuated, in part, through the RICO Defendants' extortionate demand that Waste Path Sanitary Landfill administer (at an immediate and continuing financial loss to Plaintiffs) the scheme imposed upon the Plaintiffs, in a misguided effort by the RICO Defendants to "interpose" Waste Path Sanitary Landfill between the Borrowers and Prime Financial, and "shield" Prime Financial from any inquiry into the payments.

165.   The RICO Defendants, through a pattern of racketeering activity including mail fraud, wire fraud and extortion, and implementation of the scheme, merely rearranged  the obligors of the alleged debt to Prime Financial and have stolen from Plaintiffs valuable property and property rights.

166.   The misrepresentations by and extortionate conduct of the RICO Defendants induced Plaintiffs  to part with property.

## G.   THE PREDICATE ACTS

### 1.   Extortion Of Plaintiff In Violation Of 18 U.S.C. §1951(b)(2).

167.   The Scheme and conduct against the Plaintiff, as described above, constituted extortion by the RICO Defendants in violation of 18 U.S.C. §1951(b)(2).

## 2.   **Mail And Wire Fraud**

168.   The RICO Defendants scheme to deprive Kattula of his interest in 50% of the profit of the landfill, K&B Capital of recovery of the indebtedness owed to it by Waste Path Sanitary Landfill, LLC and US Environmental Management, LLC; US Environmental Management of its interest in 600+/- acres of valuable property, and Luna Pier Truck Depot of its property, through the use of Waste Path Sanitary Landfill, constitutes a scheme to defraud.

169.   The scheme to defraud Plaintiff was systematically furthered and advanced by the use of the mails in violation of 18 U.S.C. §1341 and/or wires in violation of 18 U.S.C. §1343 including, but not limited to, those letters sent by use of the mails and attached as Exhibit "22" and "23," those letters/notes sent by use of the wires and attached as Exhibit "24," (including the fraudulent default notice dated December 14, 2006) and payments made by Waste Path Sanitary Landfill via the mails and wires to Prime Financial.

170.   The scheme to defraud Plaintiffs was systematically furthered and advanced by the use of the mails in violation of 18 U.S.C. §1341 and/or wires in violation of 18 U.S.C. §1343, insofar as letters from the RICO Defendants generated in furtherance of the fraudulent and extortionate scheme were sent to Plaintiffs by the RICO Defendants through use of the U.S. mails and/or use of the wires.

171.   The documents attached as Exhibits "22," "23" and "24," among others, were sent by the RICO Defendants via the mails and/or wires in furtherance of their scheme to defraud Plaintiffs.

172.   The RICO Defendants intended that Plaintiffs rely upon the representations made in the letters and wires.

173.   Plaintiffs reasonably relied upon the representations made by the RICO Defendants.

### 3.      Obstruction of Justice In Violation Of 18 U.S.C. §1503.

174.   The RICO Defendants violated 18 U.S.C. §1503 (obstruction of justice) by falsely representing to the United States Bankruptcy Court for the Western District of Kentucky, in an ill-conceived effort to interfere with the due administration of justice in In re LWD, Inc., et al., 03-51021, that Waste Path Sanitary Landfill had produced all documents in its possession, custody and control responsive to that subpoena duces tecum dated December 13, 2006, a copy of which is attached as Exhibit "25."

### 4.      The Pattern Of Racketeering Activity

175.   The individually specified acts of racketeering as described above have occurred within the ten years of one another, are sufficiently related and evidence sufficient

continuity to constitute a pattern of racketeering activity as that term is defined within 18 U.S.C. §1961(5).

176.    The affairs of Waste Path Sanitary Landfill were and are conducted, in whole or in part, by the RICO Defendants through a "pattern of racketeering activity" within the definition of 18 U.S.C. § 1961(5).

**H.    Relatedness**

177.    The above acts are related in terms of purpose (to obtain payment from Waste Path Sanitary Landfill to gain and retain control of the Luna Pier Property), means (fraudulent representations and/or the threat of economic ruin if the fraudulent claims are not honored results sought and achieved (obtaining payment), and Enterprise (Waste Path Sanitary Landfill, LLC).

**I.    The Threat Of Continuing Criminal Activity**

178.    The predicate acts referenced above are not isolated events.

179.    The predicate acts relied upon have occurred after March 23, 2004, and the last of the predicate acts occurred within ten (10) years after the commission of a prior act of racketeering activity.

180.    Due to the extreme financial benefits which the RICO Defendants have reaped and continue to reap as a result of their unlawful conduct, it is clear that absent Court intervention and extreme sanctions upon the RICO Defendants, that the RICO Defendants have not ceased and will not cease their racketeering schemes and practices.

### J.    Causation and Damages

181.    Plaintiffs have incurred economic loss caused by the racketeering actions by the RICO Defendants including, but not limited to:

A.    Plaintiff Robert Kattula has been denied payment of his share of the profits of Waste Path Sanitary Landfill;

B.    U.S. Environmental has been deprived of its interest in the 600 +/- acres;

C.    Plaintiff have been denied credit against the outstanding indebtedness for the payments made by Waste Path Sanitary Landfill upon the putative "leases" and "casualty agreement"; and

D.    Luna Pier Truck Depot has been denied credit for payments made, and threatened with the loss of the Luna Pier Property.

182.    As a direct and proximate result of the RICO Defendants wrongful, malicious and extortionate actions, Plaintiffs have been materially damaged in their property and business as set forth earlier in this Complaint.

183.    The RICO Defendants, by reason of, among other events, the payments by Waste Path Sanitary Landfill in excess of One Million and 00/100 ($1,000,000.00) Dollars to Prime Financial, were directly and materially benefited.

184.    As a result of the wrongful conduct by the RICO Defendants against Plaintiffs, Plaintiffs have been financially injured, and have sustained damages in excess of, Seventy-Five Thousand and 00/100 ($75,000.00) Dollars.

**WHEREFORE,** Plaintiffs pray that this Court enter its Order:

A.      Granting judgment in favor of Plaintiffs and against the RICO Defendants in such amount of damages as may be proven, but in no event less than Five Million and 00/100 ($5,000,000.00) Dollars;

B.      Treble damages pursuant to 18 U.S.C. §1964(c).

C.      Awarding in favor of Plaintiffs and against the RICO Defendants those costs, including reasonable attorneys fees, incurred in bringing this action;

D.      Awarding such other relief as may be just and equitable under the circumstances.

<u>**COUNT III**</u>

**VIOLATION OF 18 U.S.C. §1962(c)**
**(RACKETEER AND CORRUPT ORGANIZATIONS ACT)**
**(PRIME FINANCIAL AS ENTERPRISE)**

**A.      <u>The RICO Plaintiffs</u>.**

185.    The allegations set forth in paragraphs 1 through 184, above, are incorporated by reference as if fully set forth herein.

186.    K&B Capital is a Michigan limited liability company capable of holding a legal or beneficial interest in property.

187.    Robert Kattula is a natural person capable of holding a legal or beneficial interest in property.

188.    US Environmental Management is a Kentucky limited liability company capable of holding a legal or beneficial interest in property.

189.    Luna Pier Truck Depot, LLC is a Michigan limited liability company capable of holding a legal or beneficial interest in property.

190.    K&B Capital, US Environmental Management, Luna Pier Truck Depot, LLC and Robert Kattula are each a "person" within the definition of 18 U.S.C.§ 1961(3).

**B.**    **The RICO Defendants**

191.    Aaron Jade is an individual, and is a "person" within the meaning of 18 U.S.C. §1961(3).

192.    Peter M. Schneiderman is an individual, and is a "person" within the meaning of 18 U.S.C. §1961(3).

193.    Peter M. Schneiderman & Associates, P.C. is a Michigan corporation and a "person" within the meaning of 18 U.S.C. § 1961(3).

**C.    The RICO Enterprise.**

194.    Prime Financial is a Michigan corporation and an "enterprise" within the meaning of U.S.C. § 1961(4).

195.    Prime Financial  had an objective the legitimate goal of serving as a lender.

196.    Prime Financial exists as a continuing and ongoing organization distinct from the RICO Defendants.

197.    Prime Financial is an enterprise engaged in, or conducts activities which affect, interstate commerce.

198.    As a consequence of the unlawful conduct of the RICO Defendants, the legitimate objectives of Prime Financial have been thwarted, and Prime Financial has instead been used as instrumentality through which the RICO Defendants have engaged in a pattern of racketeering activity.

**D.    The RICO Defendants' Relationships With The RICO Enterprise**

199.    Aaron Jade is associated with Prime Financial, an officer of Prime Financial, and directs the affairs of Prime Financial through the provision of business advice to

Prime Financial concerning such issues as acceptable terms and conditions, the negotiation of contracts for the provision of goods and services, and the resolution of disputes with suppliers.

200.     Schneiderman and Peter M. Schneiderman & Associates are each associated with Prime Financial, directing the affairs of Prime Financial through the provision of business advice and legal services to Prime Financial.

201.     Each of RICO Defendants is associated with Prime Financial, participating, directly or indirectly, in the conduct of the affairs of Prime Financial through a pattern of racketeering activity.

202.     Each of the RICO Defendants' association with Prime Financial has continued for a period of not less than three (3) years.

### E.     The Defendants' Liability For The Acts Of The RICO Enterprise

203.     Aaron Jade, through his ownership of all of the stock of Prime Financial, and his capacity as sole office and director of Prime Financial, participates directly or indirectly in the operation and management of Prime Financial by reason of, among other conduct, directing and controlling the day-to-day operations of Prime Financial; and participating in directing the affairs of Prime Financial by establishing procedures, policies and goals for the conduct of the affairs of Prime Financial.

204.    The RICO Defendants, have participated, directly or indirectly, in the conduct of the affairs of Prime Financial through a pattern of racketeering activity;

205.    The RICO Defendants, to fulfill the illegitimate and unlawful goals of Prime Financial, controlled and directed the business affairs of Prime Financial, through the use of extortionate threats and fraudulent misrepresentations sent via the United States Mail and/or the wires, by way of conduct including, but not limited to, the following:

A.    Compelling and/or directing Waste Path Sanitary Landfill to remit payments via the U.S. mails or wire to Prime Financial in excess of the outstanding obligations of the Waste Path II Borrowers, Waste Path III Borrowers, K&B Plus Borrowers and the Luna Pier Borrowers under the Waste Path II Note; and

B.    Causing Waste Path Sanitary Landfill to remit payment via the U.S. mails to Prime Financial interest payments upon fully-satisfied debt obligations, fraudulently demanding and, characterizing such payments as "lease" payments or "consulting fees";

C.    causing each of the Prime Affiliates to enter into one or more agreements with Prime Financial, pursuant to which Prime Financial and the Prime Affiliates have agreed to act collectively with respect to the payment of fees, charges and assessments to Prime Financial under the guise of "rent" or "consulting fees," but which payments in fact are the continued

payment of interest on indebtedness that has been fully paid or otherwise fully satisfied; and

D.      Sending false "notices of default" to Plaintiffs, and commencing in violation of law foreclosure proceedings.

206.    The RICO Defendants conduct or participate (and continue to participate) directly in the conduct of the affairs of Prime Financial, through a pattern of racketeering activity.

207.    The RICO Defendants, through Prime Financial, intentionally and illegally engage in actions which are intended to interfere with and violate the rights of their intended victims.

F.      **The Pattern Of Racketeering Activity**

1.      **The Scheme Generally.**

208.    The RICO Defendants have engaged in a pattern of racketeering activity designed and intended to unlawfully increase, or cause an increase by unlawful means, and resulting in an unlawful increase in, the amount to be paid by, or on behalf of or for the benefit of Plaintiffs to Prime Financial in satisfaction of the outstanding indebtedness, if any, to Prime Financial, and at usurious rates of interest.

209.   The pattern of racketeering included the RICO Defendants' use of Prime Financial  to instill in Waste Path Sanitary Landfill the fear of economic harm, for the unlawful purpose of compelling  Waste Path Sanitary Landfill to pay sums to Prime Financial in the absence of consideration.

210.   The pattern of racketeering included the RICO Defendants' use of Prime Financial  to instill in  Waste Path Sanitary Landfill the fear of economic harm, for the unlawful purpose of proscribing any attempts by Waste Path Sanitary Landfill to replace the indebtedness to Prime Financial with less expensive financing, and instead compelling  Waste Path Sanitary Landfill to borrow money from Prime Financial and upon terms and conditions less than those otherwise commercially available solely for the purpose of meeting the economic demands of Prime Financial's "investors".

211.   The pattern of racketeering included, as a regular practice by the RICO Defendants through  Prime Financial, the fraudulent representation by  Prime Financial of  the outstanding indebtedness of Plaintiffs to Prime Financial, and the financial condition and affairs of Plaintiffs, with the intent to  deny payments to Calvert Properties (and in turn payment to Robert Kattula), and to tortiously interfere with the business and expected business relationships of Plaintiffs.   Those representations were made despite actual knowledge by the RICO Defendants that such statements were false, and/or those statements were made with a reckless disregard for the truth thereof.

212.    The pattern of racketeering further included the RICO Defendants' use of the mails and wires to obtain payment from Waste Path Sanitary Landfill for paid debt, based upon fraudulent leases and consulting agreement(s).

213.    The pattern of racketeering included conduct designed and intended to use Waste Path Sanitary Landfill to obtain, through extortion and for the financial benefit of the RICO Defendants, payments of profits of Waste Path Sanitary Landfill without concurrent payment to Robert Kattula.

214.    The pattern of racketeering included conduct designed and intended to use Waste Path Sanitary Landfill to obtain, through extortion and for the financial benefit of the RICO Defendants, the conveyance by third parties to Prime Financial or Aaron Jade of valuable property, without adequate consideration in exchange for such conveyances.

## 2.      The Unlawful Scheme.

215.    As of November, 2005, the Waste Path I Borrowers, Waste Path II Borrowers, Waste Path III Borrowers, K&B Plus Borrowers and Luna Pier Borrowers were allegedly indebted to Prime Financial.

216.    Commencing in November, 2005, the RICO Defendants used Prime Financial to engage in a course of conduct pursuant to which the RICO Defendants fraudulently promised, in exchange for fifty (50%) percent of the profits of Waste Path Sanitary Landfill, and cancellation of debt in excess of $5 Million, to (a) cancel $1,770,000.00 in debt owed by

Plaintiffs to Prime Financial, (b) terminate the Luna Pier Mortgage,(c) amortize repayment of the remaining debt over ten (10) years; and (d) share with Robert Kattula fifty (50%) percent of the true profits from the operation of the Waste Path Sanitary Landfill, which promises the RICO Defendants knew, at the time that they made such, would not be honored by Prime Financial.

217.    The fraudulent promises were made by the RICO Defendants via the United States mail and wire.

218.    The success of the scheme depended on the ability of the RICO Defendants making Plaintiffs believe that $1,770.000.00 in debt had been extinguished, but in fact preserving (albeit in disguised form) that debt, so that Prime Financial could still cause itself to be paid, and in turn receive, interest at the rate of 17% on that debt and satisfy its underlying "investors".

219.    The RICO Defendants wrongfully used extortionate threats and fraudulent representations made via the use of the United States Mail and wires to instill in the Borrowers the fear of economic harm, as a means of causing the Plaintiffs to "accept" the terms of the scheme.

220.    The scheme was effectuated, in part, through the RICO Defendants' extortionate demand that Waste Path Sanitary Landfill administer (at an immediate and continuing financial loss to Plaintiffs) the scheme imposed upon the Plaintiffs, in a misguided effort by the RICO Defendants to "interpose" Waste Path Sanitary Landfill between the

Borrowers and Prime Financial, and "shield" Prime Financial from any inquiry into the payments.

221.    The RICO Defendants, through a pattern of racketeering activity including mail fraud, wire fraud and extortion, and implementation of the scheme, merely rearranged  the obligors of the alleged debt to Prime Financial and have stolen from Plaintiffs valuable property and property rights.

222.    The misrepresentations by and extortionate conduct of the RICO Defendants induced Plaintiffs to part with property.

## G.    THE PREDICATE ACTS

### 1.    Extortion Of Plaintiff In Violation Of 18 U.S.C. §1951(b)(2).

223.    The Scheme and conduct against the Plaintiff, as described above, constituted extortion by the RICO Defendants in violation of 18 U.S.C. §1951(b)(2).

### 2.    Mail And Wire Fraud

224.    The RICO Defendants scheme to deprive Kattula of his interest in 50% of the profit of the landfill, K&B Capital of recovery of the indebtedness owed to it by Waste Path Sanitary Landfill, LLC and US Environmental Management, LLC; US Environmental

Management of its interest in 600+/- acres of valuable property, and Luna Pier Truck Depot of its property, through the use of Waste Path Sanitary Landfill, constitutes a scheme to defraud.

225.    The scheme to defraud Plaintiff was systematically furthered and advanced by the use of the mails in violation of 18 U.S.C. §1341 and/or wires in violation of 18 U.S.C. §1343 including, but not limited to, those letters sent by use of the mails and attached as Exhibit "22" and "23," those letters/notes sent by use of the wires and attached as Exhibit "24," (including fraudulent default notice dated December 14, 2006) and payments which the RICO Defendants caused Waste Path Sanitary Landfill to make via the mails and wires to Prime Financial.

226.    The scheme to defraud Plaintiffs was systematically furthered and advanced by the use of the mails in violation of 18 U.S.C. §1341 and/or wires in violation of 18 U.S.C. §1343, insofar as letters from the RICO Defendants generated in furtherance of the fraudulent and extortionate scheme were sent to Plaintiffs by the RICO Defendants through use of the U.S. mails and/or use of the wires.

227.    The RICO Defendants intended that Plaintiffs rely upon the representations made in the letters and wires.

228.    Plaintiffs reasonably relied upon the representations made by the RICO Defendants.

229.    The documents attached as Exhibits "22," "23" and "24," among others, were sent by the RICO Defendants via the mails and/or wires in furtherance of their scheme to defraud Plaintiffs.

### 3.    Obstruction of Justice In Violation Of 18 U.S.C. §1503.

230.    The RICO Defendants violated 18 U.S.C. §1503 (obstruction of justice) by falsely representing to the United States Bankruptcy Court for the Western District of Kentucky, in an ill-conceived effort to interfere with the due administration of justice in In re LWD, Inc., et al., 03-51021, that Waste Path Sanitary Landfill had produced all documents in its possession, custody and control responsive to that subpoena duces tecum dated December 13, 2006, a copy of which is attached as Exhibit "25."

### 4.    The Pattern Of Racketeering Activity

231.    The individually specified acts of racketeering as described above have occurred within the ten years of one another, are sufficiently related and evidence sufficient continuity to constitute a pattern of racketeering activity as that term is defined within 18 U.S.C. §1961(5).

232.    The affairs of Prime Financial were and are conducted, in whole or in part, by the RICO Defendants through a "pattern of racketeering activity" within the definition of 18 U.S.C. § 1961(5).

### H.    Relatedness

233.    The above acts are related in terms of purpose (to obtain payment from Waste Path Sanitary Landfill to gain and retain control of the Luna Pier Property), means (fraudulent representations and/or the threat of economic ruin if the fraudulent claims are not honored results sought and achieved (obtaining payment), and Enterprise (Waste Path Sanitary Landfill, LLC).

## II.    The Threat Of Continuing Criminal Activity

234.    The predicate acts referenced above are not isolated events.

235.    The predicate acts relied upon have occurred after March 23, 2004, and the last of the predicate acts occurred within ten (10) years after the commission of a prior act of racketeering activity.

236.    Due to the extreme financial benefits which the RICO Defendants have reaped and continue to reap as a result of their unlawful conduct, it is clear that absent Court intervention and extreme sanctions upon the RICO Defendants, that the RICO Defendants have not ceased and will not cease their racketeering schemes and practices.

## J.    Causation and Damages

237.    Plaintiffs have incurred economic loss caused by the racketeering actions by the RICO Defendants including, but not limited to:

A.    Plaintiff Robert Kattula has been denied payment of his share of the profits of Waste Path Sanitary Landfill;

B.    U.S. Environmental has been deprived of its interest in the 600 +/- acres;

C.    Plaintiff have been denied credit by Prime Financial against the outstanding indebtedness for the payments made by Waste Path Sanitary Landfill upon the putative "leases" and "casualty agreement"; and

D.    Luna Pier Truck Depot has been denied credit for payments made (if any portion of the debt remains outstanding), and threatened with the loss of the Luna Pier Property.

238.    As a direct and proximate result of the RICO Defendants wrongful, malicious and extortionate actions, Plaintiffs have been materially damaged in their property and business as set forth earlier in this Complaint.

239.    The RICO Defendants, by reason of, among other events, the payments by Waste Path Sanitary Landfill in excess of One Million and 00/100 ($1,000,000.00) Dollars to Prime Financial, were directly and materially benefited.

240.    As a result of the wrongful conduct by the RICO Defendants against Plaintiffs, Plaintiffs have been financially injured, and have sustained damages in excess of, Seventy-Five Thousand and 00/100 ($75,000.00) Dollars.

**WHEREFORE,** Plaintiffs pray that this Court enter its Order:

A.    Granting judgment in favor of Plaintiffs and against the RICO Defendants in such amount of damages as may be proven, but in no event less than Five Million and 00/100 ($5,000,000.00) Dollars;

B.    Treble damages pursuant to 18 U.S.C. §1964(c).

C.    Awarding in favor of Plaintiffs and against the RICO Defendants those costs, including reasonable attorneys fees, incurred in bringing this action;

D.    Awarding such other relief as may be just and equitable under the circumstances.

## COUNT IV

## REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF (LUNA PIER MORTGAGE)

241.    The allegations set forth in paragraphs 1 through 240, above, are incorporated by reference as if fully set forth herein.

242.    In connection with the Luna Pier Note, K&B Capital granted in favor of Prime Financial the Luna Pier Mortgage on the Luna Pier Property.

243.    As part of the Restructure Agreement, Prime Financial agreed to terminate the Luna Pier Mortgage interest in the Luna Pier Property.

244.   As acknowledged in writing by Prime Financial (see Exhibit "26"), the Luna Pier Note has been paid in full.

245.   Prime Financial has, in breach of the Restructure Agreement, failed and/or refused to terminate the Luna Pier Mortgage and has further commenced non-judicial foreclosure proceedings against the Luna Pier Property; sale of the Luna Pier Property is scheduled for March 29, 2007.

246.   Even assuming that Prime Financial was not required to terminate the Luna Pier Mortgage, Prime Financial has commenced and maintained the non-judicial foreclosure proceedings in the absence of any judicial proceeding, claiming to have the right to foreclose "by advertisement" pursuant to a claimed "power of sale" in the Luna Pier Mortgage.

247.   The "power of sale" upon which Prime Financial relies provides, in part, as follows:

> If default is made in the satisfaction of any of the Obligations, including the sums of money to be paid to Prime under the Note or this Mortgage, Prime may, at its option **and without notice** (except as specifically provided in Section 22), declare the Obligations due and payable, and sell the Collateral or cause to be sold at public auction...(emphasis supplied).

248.    Section 22 of the Luna Pier Mortgage does not contain any notice provisions.

249.    The claimed power of sale in the Luna Pier Mortgage is invalid as a matter of law, since it purports to give Prime Financial the right to sell the Luna Pier Property without notice to K&B Capital.

250.    A dispute exists between the parties as to the enforceability of the "power of sale" provision in the Luna Pier Mortgage.

251.    Prime Financial did not provide Plaintiffs with actual notice of the proposed sale.

252.    The Luna Pier Property is unique.

253.    If the scheduled sale of the Luna Pier Property proceeds, Luna Pier Truck Depot, LLC will be irreparably harmed.

**WHEREFORE**, Plaintiffs pray that this Court enter its Order:

A.      Compelling Prime Financial to terminate and discharge the Luna Pier Mortgage;

B.      Declaring and adjudging that even to the extent it remains enforceable, the Luna Pier Mortgage does not contain a valid and enforceable power of sale;

C.      Compelling Prime Financial to take all such steps as are necessary to prevent the scheduled foreclosure sale of the Luna Pier Property from proceeding as scheduled;

D.      Enjoining Prime Financial from all further efforts to foreclose upon the Luna Pier Property other than through a judicial foreclosure proceeding; and

E.      Awarding such other relief in favor of K&B Capital, Robert Kattula and Luna Pier Truck Depot, LLC, and against Prime Financial, as may be just and equitable under the circumstances.

## COUNT V

## FRAUD

254.    The allegations set forth in paragraphs 1 through 253, above, are incorporated by reference as if fully set forth herein.

255.    Plaintiffs, on the one hand, and Prime Financial, on the other, entered into the Restructure Agreement.

256.    The Restructure Agreement was memorialized, in part, in the Memorandum of Understanding.

257.    At the time Prime Financial entered into the Restructure Agreement, and to induce Plaintiffs to enter into the Restructure Agreement, Prime Financial represented to Plaintiffs that, among other representations, (a) $1,770,000.00 of the aggregate debt owing to Prime Financial from the K&B Borrowers would be canceled; (b) Prime Financial would terminate its Luna Pier Mortgage; (c) Prime Financial would look solely to payment from Waste Path Sanitary Landfill to satisfy the remaining indebtedness (if any) due under the K&B Plus Note, Waste Path II Note, Waste Path III Note and Luna Pier Note, as such obligations were amortized over ten (10) years at seventeen (17%) percent per annum; and (d) Robert Kattula would receive fifty (50%) percent of the annual revenue of Waste Path Sanitary Landfill after deduction only for those items described in the Memorandum of Understanding (the "Representations").

258.    The Representations were false.

259.    The Representations were made with the intent that Plaintiffs enter into the Restructure Agreement.

260.    At the time Prime Financial entered into the Restructure Agreement, Prime Financial did not intend to honor its obligations under that Restructure Agreement.

261.    In reasonable reliance upon the Representations, Plaintiffs entered into the Restructure Agreement; but for the Representations, Plaintiffs would not have entered into the Restructure Agreement.

**WHEREFORE**, Plaintiffs pray that this Court enter its Order:

A.    Rescinding the Restructure Agreement, and declaring and adjudging it void <u>ab</u> <u>initio</u>;

B.    Compelling Defendants to immediately reconvey to Plaintiffs and all other persons (including but not limited to U.S. Environmental Management) all real and personal property conveyed to Defendants, or any of them, in furtherance of the Restructure Agreement including, but not limited to, the 600+/- acres conveyed by U.S. Environmental Management to Prime-Calvert, the 124 acres conveyed to Prime Financial, and the machinery and equipment conveyed to Calvert Machinery;

C.    Restoring the status <u>quo</u> <u>ante</u> as of November 16, 2005, immediately prior to entry into the Restructure Agreement;

D.    Compelling Defendants to return to Plaintiffs all funds received by Defendants, or any of them, or paid to Defendants, or any of them, by, on behalf or for the benefit of any of the Plaintiffs, or on account of or with respect to (i) the Waste Path I Note, the Waste Path II Note, the Waste

Path III Note, the K&B Plus Note, and/or the Luna Pier Note, or (ii) the assets to be returned including, but not limited to, all "lease" payments;

E.     Awarding in favor of Plaintiffs and against Defendants such other relief as may be just and equitable under the circumstances.

## COUNT VI

**DECLARATORY RELIEF**
**(USURY – WASTE PATH I NOTE)**

262.     The allegations set forth in paragraphs 1 through 261, above, are incorporated by reference as if fully set forth herein.

263.     The Waste Path I Borrowers executed the Waste Path I Note in favor of Prime Financial.

264.     The stated interest rate in the Waste Path I Note is seventeen (17%) percent per annum.

265.     The bona fide primary security for the Waste Path I Note is not a lien against real property other than a single family residence.

266.     The actual interest rate charged by Prime Financial exceeds twenty-five (25%) percent per annum.

267.    The Waste Path I Note, and obligations of the Waste Path I Borrowers are governed by Michigan law.

268.    The stated seventeen (17%) percent interest rate is violative of MCL § 438.31 and is therefore usurious.

**WHEREFORE,** the Waste Path I Borrowers pray that this Court enter its Order:

A.    Declaring and adjudging that the interest rate charged by Prime Financial to the Waste Path I Borrowers on the Waste Path I Note is usurius;

B.    Ordering that all payments previously made by, on behalf of or for the benefit of the Waste Path I Borrowers be deemed to have been made against the principal amount of the Waste Path I Note;

C.    Declaring and adjudging the remaining principal balance, if any, due under the Waste Path I Note;

D.    Awarding in favor of the Waste Path I Borrowers and against Prime Financial those costs, including actual attorneys' fees, incurred in bringing this action; and

E.      Awarding in favor of the Waste Path I Borrowers and against Prime Financial such other relief as may be just and equitable under the circumstances.

## COUNT VII

### DECLARATORY RELIEF
### (USURY – WASTE PATH II NOTE)

269.    The allegations set forth in paragraphs 1 through 268, above, are incorporated by reference as if fully set forth herein.

270.    The Waste Path II Borrowers executed the Waste Path II Note in favor of Prime Financial.

271.    The stated interest rate in the Waste Path II Note is seventeen (17%) percent per annum.

272.    The bona fide primary security for the Waste Path II Note is not a lien against real property other than a single family residence.

273.    The actual interest rate charged by Prime Financial exceeds twenty-five (25%) percent per annum.

274.    The Waste Path II Note, and obligations of the Waste Path II Borrowers are governed by Michigan law.

275.   The stated seventeen (17%) percent interest rate is violative of MCL **§** 438.31 and is therefore usurious.

**WHEREFORE,** the Waste Path II Borrowers pray that this Court enter its Order:

A.   Declaring and adjudging that the interest rate charged by Prime Financial to the Waste Path II Borrowers on the Waste Path II Note is usurius;

B.   Ordering that all payments previously made by, on behalf of or for the benefit of the Waste Path II Borrowers on the Waste Path II Note be deemed to have been made against the principal amount of the Waste Path II Note;

C.   Declaring and adjudging the remaining principal balance, if any, due under the Waste Path II Note;

D.   Awarding in favor of the Waste Path II Borrowers and against Prime Financial those costs, including actual attorneys' fees, incurred in bringing this action; and

E.   Awarding in favor of the Waste Path II Borrowers and against Prime Financial such other relief as may be just and equitable under the circumstances.

## COUNT VIII

## DECLARATORY RELIEF
### (USURY – WASTE PATH III NOTE)

276.    The allegations set forth in paragraphs 1 through 275, above, are incorporated by reference as if fully set forth herein.

277.    The Waste Path III Borrowers executed the Waste Path II Note in favor of Prime Financial.

278.    The stated interest rate in the Waste Path III Note is seventeen (17%) percent per annum.

279.    The bona fide primary security for the Waste Path III Note is not a lien against real property other than a single family residence.

280.    The actual interest rate charged by Prime Financial exceeds twenty-five (25%) percent per annum.

281.    The Waste Path II Note, and obligations of the Waste Path III Borrowers are governed by Michigan law.

282.    The stated seventeen (17%) percent interest rate is violative of MCL § 438.31 and is therefore usurious.

**WHEREFORE,** the Waste Path III Borrowers pray that this Court enter its Order:

A.      Declaring and adjudging that the interest rate charged by Prime Financial to the Waste Path III Borrowers on the Waste Path III Note is usurious;

B.      Ordering that all payments previously made by, on behalf of or for the benefit of the Waste Path III Borrowers on the Waste Path III Note be deemed to have been made against the principal amount of the Waste Path III Note;

C.      Declaring and adjudging the remaining principal balance, if any, due under the Waste Path III Note;

D.      Awarding in favor of the Waste Path III Borrowers and against Prime Financial those costs, including actual attorneys' fees, incurred in bringing this action; and

E.      Awarding in favor of the Waste Path III Borrowers and against Prime Financial such other relief as may be just and equitable under the circumstances.

<u>**COUNT IX**</u>

<u>**DECLARATORY RELIEF**</u>
**(USURY – K&B PLUS NOTE)**

283.    The allegations set forth in paragraphs 1 through 282, above, are incorporated by reference as if fully set forth herein.

284.    The K&B Plus Note Borrowers executed the K&B Plus Note in favor of Prime Financial.

285.    The stated interest rate in the K&B Plus Note is seventeen (17%) percent per annum.

286.    The <u>bona fide</u> primary security for the K&B Plus Note is not a lien against real property other than a single family residence.

287.    The actual interest rate charged by Prime Financial exceeds twenty-five (25%) percent per annum.

288.    The K&B Plus Note, and obligations of the K&B Plus Note Borrowers are governed by Michigan law.

289.    The stated seventeen (17%) percent interest rate is violative of MCL § 438.31 and is therefore usurious.

**WHEREFORE,** the K&B Plus Note Borrowers pray that this Court enter its Order:

A.   Declaring and adjudging that the interest rate charged by Prime Financial to the K&B Plus Borrowers on the K&B Plus Note is usurius;

B.   Ordering that all payments previously made by, on behalf of or for the benefit of the K&B Plus Borrowers on the K&B Plus Note be deemed to have been made against the principal amount of the K&B Plus Note;

C.   Declaring and adjudging the remaining principal balance, if any, due under the K&B Plus Note;

D.   Awarding in favor of the K&B Plus Borrowers and against Prime Financial those costs, including actual attorneys' fees, incurred in bringing this action; and

E.   Awarding in favor of the K&B Plus Borrowers and against Prime Financial such other relief as may be just and equitable under the circumstances.

## COUNT X

### DECLARATORY RELIEF
### (USURY – LUNA PIER NOTE)

290.    The allegations set forth in paragraphs 1 through 289, above, are incorporated by reference as if fully set forth herein.

291.    The Luna Pier Borrowers executed the Luna Pier Note in favor of Prime Financial.

292.    The Luna Pier Note has been paid in full.

293.    Prime Financial has acknowledged in writing that the Luna Pier Note has been paid in full.

294.    The stated interest rate in the Luna Pier Note is seventeen (17%) percent per annum.

295.    The bona fide primary security for the Luna Pier Note is not a lien against real property other than a single family residence.

296.    The actual interest rate charged by Prime Financial exceeds twenty-five (25%) percent per annum.

297.    The Luna Pier Note, and obligations of the Luna Pier Note Borrowers are governed by Michigan law.

298.    The stated seventeen (17%) percent interest rate is violative of MCL § 438.31 and is therefore usurious.

**WHEREFORE,** the Luna Pier Borrowers pray that this Court enter its Order:

A.    Declaring and adjudging that the interest rate charged by Prime Financial to the Luna Pier Borrowers on the Luna Pier Note is usurius;

B.    Ordering that all payments previously made by, on behalf of or for the benefit of the Luna Pier Borrowers on the Luna Pier Note be deemed to have been made against the principal amount of the Luna Pier Note;

C.    Declaring and adjudging the remaining principal balance, if any, due under the Luna Pier Note;

D.    Awarding in favor of the Luna Pier Borrowers and against Prime Financial those costs, including actual attorneys' fees, incurred in bringing this action; and

    E.      Awarding in favor of the Luna Pier Note Borrowers and against Prime Financial such other relief as may be just and equitable under the circumstances.

## COUNT XI

### DECLARATORY RELIEF
### (PETER SCHNEIDERMAN – MAY 15, 2006 AGREEMENT)

299.    The allegations set forth in paragraphs 1 through 298, above, are incorporated by reference as if fully set forth herein.

300.    Pursuant to the May 15, 2006 Agreement, Schneiderman undertook a fiduciary duty to Robert Kattula to remit to Mr. Kattula the consulting fees due under that Agreement.

301.    Schneiderman has breached his duty to Robert Kattula.

302.    As a proximate cause of the breach of duty, Kattula has suffered damages.

**WHEREFORE**, Robert Kattula prays that this Court enter its Order:

    A.      Granting judgment in favor of Plaintiffs and against Defendant Peter Schneiderman in such amount as may be proven at trial;

B.      Awarding in favor of Plaintiffs and against Defendant Peter Schneiderman those costs, including actual attorneys' fees, incurred in seeking this relief; and

C.      Awarding such other relief as may be just and equitable under the circumstances.

## COUNT XII

### DECLARATORY RELIEF
### (FDCPA VIOLATION)

303.    The allegations set forth in paragraphs 1 through 302, above, are incorporated by reference as if fully set forth herein.

304.    Schneidernman is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

305.    Peter M. Schneiderman & Associates is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

306.    As evidenced by the December 14, 2006 "Notice of Default" and subsequent February 23, 2007 "Notice" attached as Exhibits '26" and '27," the Luna Pier Note is a "debt' within the meaning of 15 U.S.C. § 1692a(5).

307.   Robert Kattula is a "consumer" within the meaning of 15 U.S.C. §
1692a(3).

308.   Schneiderman and Peter M. Schneiderman & Associates have, in violation
of 15 U.S.C. § 1692e, attempted to collect from Robert Kattula a debt by way of false, deceptive
or misleading representations including, but not limited to:

A.   The false representation of the amount of the debt allegedly owed on the
Luna Pier Note, in violation of 15 U.S.C. § 1692e(2)(A);

B.   The legal status of the Luna Pier Note, in violation of 15 U.S.C. §
1692e(2)(A);

C.   The representation that nonpayment of the Luna Pier Note will result in
sale of the Luna Pier Property, in violation of 15 U.S.C. § 1692e(4);

D.   The threat of foreclosure upon the Luna Pier Property (which action
cannot legally be taken), in violation of 15 U.S.C. § 1692e(5); and

E.   The failure to disclose and/or acknowledge that the Luna Pier Note had
been satisfied, which failure constitutes a violation of 15 U.S.C. §
1692e(10).

309.    The threat to take, and the institution of foreclosure proceedings against the Luna Pier Property constitutes a violation of 15 U.S.C. § 1692f(6)(A).

310.    Schneiderman and Schneiderman & Associates  have, in violation of 15 U.S.C. § 1692g(a), failed to send to Robert Kattula within five (5) days of the December 14, 2006 "Notice of Default" the statutorily-required written notice.

**WHEREFORE**, Robert Kattula prays that this Court enter its Order:

A.    Awarding in favor of Robert Kattula and against Schneiderman and Peter M. Schneiderman & Associates the actual damages sustained by Robert Kattula as a result of the violations;

B.    Awarding in favor of Robert Kattula such additional damages as the Court may allow; and

C.    Awarding in favor of Kattula reasonable attorneys' fees as may be determined by the Court.

## COUNT XIII

## REQUEST FOR ACCOUNTING AND RECEIVER

311.    The allegations set forth in paragraphs 1 through 310, above, are incorporated by reference as if fully set forth herein.

312.    Pursuant to the Restructure Agreement Defendants (other than Schneiderman) owed a duty to account to Robert Kattula for any and all revenue, income, fees, gains, profits, properties, monies, contracts, accounts receivable, notes receivable, or other receipts or assets, arising from the operation and performance of Waste Path Sanitary Landfill.

313.    Defendants (other than Schneiderman) owed to Plaintiff a contractual duty and a duty of good faith and fair dealing to maximize the revenue and net profits realized from the operation and performance of Waste Path Sanitary Landfill, and to minimize the actual and necessary costs associated with the operation and performance of Waste Path Sanitary Landfill.

314.    Defendants (other than Schneiderman) breached their contractual and good faith duties to Plaintiff by, in addition to that conduct described above and such other conduct as may be discovered, failing to pay Kattula his agreed-upon share of the revenues of Waste Path Sanitary Landfill; entering into fictitious leases intended to preserve the payment to Prime Financial of interest upon sums no longer due or owing; charging against the revenue of Waste Path Sanitary Landfill expenses not actually incurred by Waste Path Sanitary Landfill; failing to remit to Plaintiff Kattula his share of the true net profits from operation and performance of Waste Path Sanitary Landfill; concealing the true net profits realized from the

operation and performance of Waste Path Sanitary Landfill; failing to credit against the indebtedness owing to Prime Financial all of the payments made by Waste Path Sanitary Landfill; and failing to terminate the Luna Pier Mortgage and commencing foreclosure proceedings against the Luna Pier Property.

315.    A true and equitable accounting of the monies due to Kattula is required, and the remaining amount (if any) due from the Borrowers to Prime Financial, and the use of the Court's equitable powers is needed in order to (a) compel Defendants to determine Kattula's share of the true assets and true net profits earned and to be realized, and any profits realized and to be realized by Defendants by retaining and therefore using Kattula's share of the true net profits realized from the operation and performance of Waste Path Sanitary Landfill which, but for Defendants' own wrongful conduct, should have been and are required to be remitted to Plaintiff; and (b) determine the remaining indebtedness due to Prime Financial.

316.    As part of the accounting that is required, it is or it may become necessary to provide for the tracing of assets to determine if any assets or profits have been dissipated, or removed or lost, and to provide for the imposition of a constructive trust or an equitable lien on the assets of Defendants, to ensure that a full, accurate, and complete accounting of all of the assets and true net income relating to the operation and performance of Waste Path Sanitary Landfill and Defendants' liability to Plaintiff, is determined and rendered by this Court.

317.    Defendants have failed and refused to provide information, including financial information, about Waste Path Sanitary Landfill.

318.    Legal remedies are not adequate and Plaintiffs require the equitable remedy of an accounting, injunctive relief, and equitable lien, and the imposition of a constructive trust in order to obtain full and complete relief.

319.    Plaintiffs do not know what amount, if any, may be revealed by such accounting as being owed to Plaintiffs, and, therefore, makes no specific demand for monetary relief at the present time.

**WHEREFORE,** Plaintiffs pray that this Court enter its Order:

A.      Compelling Defendants to fully and justly account for the actual net profit realized and to be realized through the operation and performance of Waste Path Sanitary Landfill;

B.      Compelling that an accounting be ordered and taken by this Court, or under the direction of this Court, of each and every transaction conducted by Defendants with respect to the operation and performance of Waste Path Sanitary Landfill;

C.      Accounting for the payments to any of the Defendants other than as agreed in the Restructure Agreement;

D.      Accounting for remittances to Prime Financial other than as contractually agreed in the Restructure Agreement;

E.      Compelling Defendants to pay over to Plaintiffs whatever sum may be found due from Defendants to Plaintiffs according to the accounting taken by this Court;

F.      Ordering Defendants to appear before this Court at a time and place to be determined by this Court and to then and there show cause, if any, why a Receiver should not be appointed; and

G.      Appointing a proper person selected by this Court to act as a Permanent Receiver to take possession and control of the assets, profits, proceeds, property and  all income from the operation and performance of Waste Path Sanitary Landfill, and all other contracts, monies, things of value or rights of which the Defendants, or any of them, has in or under its possession, custody or control, together with the books of account of Defendants, and to collect all of the accounts and indebtedness due with respect to Plaintiffs and/or Waste Path Sanitary Landfill, and that the Receiver be appointed by this Court during the pendency of this action, and continue in such position until all of the true net income distributed to the parties in accordance with its respective rights to such assets, profits, proceeds, property and  income.

## COUNT XIV

### BREACH OF FIDUCIARY DUTY/FAILURE TO ACCOUNT
### FOR ECONOMIC BENEFITS AND PROFITS

320.    The allegations set forth in paragraphs 1 through 319, above, are incorporated by reference as if fully set forth herein.

321.    Defendants Aaron Jade or Prime Financial as a member in Calvert Properties, had, by law, a fiduciary duty to Robert Kattula to account for any benefit and hold as trustee for Robert Kattula any profit derived by Defendants without the consent of Plaintiffs from any transaction connected with the operation of Waste Path Sanitary Landfill or from any use by Defendants of property belonging to or used by Waste Path Sanitary Landfill subsequent to the Restructure Agreement.

322.    Defendants breached their fiduciary duties to Plaintiffs by failing to account for the substantial benefits and profits derived by Defendants without the consent of Plaintiffs from the transactions connected with the operation of Waste Path Sanitary Landfill or from the use by Defendants of property belonging to the Partnership.

323.    As a proximate cause of Defendants' breach of its fiduciary duties to Plaintiffs, Plaintiffs have suffered damages in an amount in excess of Seventy-Five Thousand and 00/100 ($75,000.00) Dollars exclusive of interest, costs and attorneys' fees.

**WHEREFORE,** Plaintiffs pray that this Court enter its Order:

A.   Granting judgment in favor of Plaintiffs and against Defendants in such amount of damages, including interest, as may be proven;

B.   Awarding in favor of Plaintiffs and against Defendants exemplary damages based upon Defendant's outrageous conduct;

C.   Awarding in favor of Plaintiffs and/or Waste Path Sanitary Landfill and against Defendants those costs, including reasonable attorneys fees, incurred in bringing this action; and

D.   Awarding such other relief as may be just and equitable under the circumstances.

## COUNT XV

## PROMISSORY ESTOPPEL

324.   The allegations set forth in paragraphs 1 through 323, above, are incorporated by reference as if fully set forth herein.

325.   K&B Capital purchased that real property commonly known as 3949 Luna Pier Road, Erie Township, Monroe County, Michigan (the "Luna Pier Property"), for use as a truck stop.

326.    On November 15, 2005 Prime Financial promised to subordinate the Luna Pier Mortgage to third party financing, in an amount not to exceed $3,800,000.00 and to terminate its mortgage interest on or before January 3, 2006 (See Exhibit "26.")

327.    On November 16, 2005, as part of the Restructure Agreement, Prime Financial reaffirmed its promise to subordinate the Luna Pier Mortgage to third party financing, in an amount not to exceed $3,800,000.00 and to terminate its mortgage interest on or before January 3, 2006 (See Exhibit "26").

328.    In reasonable reliance upon the promises by Prime Financial, among other promises by Prime Financial, Luna Pier Truck Depot, LLC agreed to become a co-borrower on the Luna Pier Note and secured a commitment for financing in the amount of $3,875,000.00, for the purpose of completing the improvements to the truck stop on the Luna Pier Property.

329.    Prime Financial breached its promise, and has wrongfully refused to subordinate its mortgage interest and has further wrongfully refused to terminate its mortgage interest.

330.    As a proximate cause of Prime Financial's breach, Luna Pier Truck Depot, LLC has suffered damages in excess of Seventy-Five Thousand and 00/100 ($75,000.00) Dollars (exclusive of interest, costs and attorneys' fees) by reason of increased construction costs and lost profits (since the Truck Stop has not yet been completed).

**WHEREFORE**, Luna Pier Truck Depot, LLC prays that this Court enter its Order:

A.   Compelling Prime Financial to execute and deliver all documents and instruments necessary to terminate its mortgage interest in the Luna Pier Property or, at a minimum, subordinate its Luna Pier Mortgage to third party financing not to exceed Three Million Eight Hundred Thousand and 00/100 ($3,800,000.00) Dollars;

B.   Awarding in favor of Luna Pier Truck Depot, LLC and against Prime Financial damages in such amount as may be proven;

C.   Awarding in favor of Luna Pier Truck Depot, LLC and against Prime Financial those costs, including actual attorneys' fees, incurred in seeking this relief; and

D.   Awarding in favor of Luna Pier Truck Depot, LLC and against Prime Financial such other relief as may be just and equitable under the circumstances.

## COUNT XVI

## DECLARATORY RELIEF

331.   The allegations set forth in paragraphs 1 through 330, above, are incorporated by reference as if fully set forth herein.

332.   An actual controversy and dispute exists between the parties as to the amount, if any, due under each of the following instruments and the remaining collateral, if any, for that indebtedness:

      A.      The K&B Plus Note;

      B.      The Waste Path II Note;

      C.      The Waste Path III Note; and

      D.      The Luna Pier Note.

333.   A dispute exists between the parties as to the existence of a default, if any, by the Borrowers and/or the Guarantors (if any) under the documents and instruments executed in connection with the Notes identified in the preceding paragraph.

334.   A declaration of the rights and legal relations of the parties is necessary to guide the parties in the conduct of their affairs.

**WHEREFORE**, Plaintiffs pray that this Court enter its Order pursuant to 28 U.S.C. **§§** 2201 and 2202:

A.  Declaring and adjudging that the K&B Plus Borrowers are not in default of any of their obligations under the K&B Plus Note or any of the documents executed in connection with that instrument;

B.  Declaring and adjudging that the Waste Path II Borrowers are not in default of any of their obligations under the Waste Path II Note or any of the documents executed in connection with that instrument;

C.  Declaring and adjudging that the Waste Path III Borrowers are not in default of any of their obligations under the Waste Path III Note or any of the documents executed in connection with that instrument; and

D.  Declaring and adjudging that the Luna Pier Borrowers are not in default of any of their obligations under the Luna Pier Note or any of the documents executed in connection with that instrument; and

E.  Declaring and adjudging the actual amount(s), if any, due under the K&B Plus Note;

F.  Declaring and adjudging the actual amount(s), if any, due under the Waste Path II Note;

G.    Declaring and adjudging the actual amount(s), if any, due under the Waste Path III Note;

H.    Declaring and adjudging the actual amount(s), if any, due under the Luna Pier Note; and

I.    Awarding in favor of Plaintiffs and against Defendants such other relief as may be just and equitable under the circumstances.

## COUNT XVII

## (BREACH OF FIDUCIARY DUTY)

335.    The allegations set forth in paragraphs 1 through 334, above, are incorporated by reference as if fully set forth herein.

336.    Prime Financial and Aaron Jade control, directly or indirectly, the business affairs of Waste Path Sanitary Landfill, LLC, Calvert Properties, Prime-Calvert and Calvert Machinery.

337.    K&B Capital, Luna Pier Truck Depot, LLC and Kattula reposed in Prime Financial and Aaron Jade trust and confidence, that the affairs of Waste Path Sanitary Landfill would be managed in such manner as to maximize the revenue and profits of Waste Path Sanitary Landfill, that Waste Path Sanitary Landfill would make those payments to Prime Financial as required under the Restructure Agreement (including the Memorandum of

Understanding), and that the balance of the revenue of Waste Path Sanitary Landfill would be remitted to Calvert Properties and thereafter distributed equally to Prime Financial and Robert Kattula.

338.    Prime Financial and Aaron Jade owed (and continue to owe) a fiduciary duty to K&B Capital and Robert Kattula, and the balance of the Borrowers.

339.    Prime Financial and Aaron Jade have breached their fiduciary duty to K&B Capital, Robert Kattula and the balance of the Borrowers by reason of the conduct described above including, but not limited to:

A.    the diversion of revenue of Waste Path Sanitary Landfill to or for the benefit of Prime Financial and/or Aaron Jade, through putative "leases" of real and personal property by the Prime Affiliates, and not authorized or contemplated by the Restructure Agreement or Memorandum of Understanding;

B.    the diversion of revenue of Waste Path Sanitary Landfill to or for the benefit of Prime Financial and/or Aaron Jade, through one ore more "consulting agreements" not authorized or contemplated by the Restructure Agreement or Memorandum of Understanding;

C.    the failure and/or refusal to remit to Robert Kattula fifty (50%) percent of the revenue of Calvert Properties, LLC;

D.      the failure and/or refusal to terminate the Luna Pier Mortgage; and

E.      the false declaration of an alleged "default" by the Luna Pier Borrowers, and unlawfully commencing foreclosure proceedings, in an effort to seize control of the Luna Pier Property for the personal gain and profit of Prime Financial and Aaron Jade.

340.    As a proximate cause of the breaches of fiduciary duty, Plaintiffs have suffered damages in excess of Seventy-Five Thousand and 00/100 ($75,000.00) Dollars exclusive of interest, costs and attorneys' fees.

**WHEREFORE**, Plaintiffs pray that this Court enter its Order:

A.      Granting a judgment in favor of Plaintiffs and against Prime Financial and Aaron Jade, jointly and severally, in such amount of damages as may be proven;

B.      Compelling the termination of the Luna Pier Mortgage;

C.      Enjoining the continued prosecution by Prime Financial of foreclosure proceedings against the Luna Pier Property;

D.      Awarding in favor of Plaintiffs and against Prime Financial and Aaron Jade those costs, including actual attorneys' fees, incurred in bringing this action and seeking this relief; and

E.      Awarding in favor of Plaintiffs and against Prime Financial and Aaron Jade such other relief as may be just and equitable under the circumstances.

## COUNT XVIII

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP/EXPECTANCY

341.    The allegations set forth in paragraphs 1 through 340, above, are incorporated by reference as if fully set forth herein.

342.    Luna Pier Truck Depot, LLC and Sterling Bank had a business relationship and/or expectancy, pursuant to which Sterling Bank had agreed to loan to Luna Pier Truck Depot, LLC the funds necessary to allow Luna Pier Truck Depot to complete construction of the truck depot located on the Luna Pier Property.

343.    Prime Financial and Aaron Jade were aware of the business expectancy between Luna Pier Truck Depot, LLC and Sterling Bank.

344.    Prime Financial and Aaron Jade falsely represented to Sterling Bank that Robert Kattula had no interest in the Waste Path Sanitary Landfill.

345.    The misrepresentations were made with the intent of causing Sterling Bank to terminate the business expectancy between Sterling Bank and Luna Pier Truck Depot.

346.    The misrepresentations caused Sterling Bank to terminate its loan commitment to Luna Pier Truck Depot.

347.    As a proximate cause of the misrepresentations by Prime Financial and Aaron Jade, Luna Pier Truck Depot, LLC has suffered damages in excess of in excess of Seventy-Five Thousand and 00/100 ($75,000.00) Dollars exclusive of interest, costs and attorneys' fees.

**WHEREFORE**, Plaintiffs pray that this Court enter its Order:

A.    Granting a judgment in favor of Plaintiffs and against Prime Financial and Aaron Jade, jointly and severally, in such amount of damages as may be proven;

B.    Awarding in favor of Plaintiffs and against Prime Financial and Aaron Jade those costs, including actual attorneys' fees, incurred in bringing this action and seeking this relief; and

C.  Awarding in favor of Plaintiffs and against Prime Financial and Aaron Jade such other relief as may be just and equitable under the circumstances.

Respectfully submitted,

REED WICKER PLLC

By: /s/ Steven Reed
      Steven Reed
      Kent Wicker
Attorneys for Plaintiffs
2100 Waterfront Plaza
321 West Main Street
Louisville, Kentucky 40202
Telephone:  (502) 572-2500
Steve@reedwicker.com

NEDELMAN PAWLAK, PLLC

By: /s/ Michael A. Nedelman
      Michael A. Nedelman (P35433)
Attorneys for Plaintiffs
Dated:  March ___, 2007          32000 Northwestern Highway, Suite 240
Farmington Hills, Michigan 48334
Telephone:  (248) 855-8888
mnedelman@ nedelmanpawlak.com